

# COURT OF APPEALS
## SECOND DISTRICT OF TEXAS
## FORT WORTH

### NO. 02-09-00441-CV

IN THE INTEREST OF
K.B., A CHILD

------------

FROM THE 323RD DISTRICT COURT OF TARRANT COUNTY

------------

## MEMORANDUM OPINION[1]

------------

### I. INTRODUCTION

Appellant Mother appeals from the trial court's judgment terminating her parental rights to her son K.B. In four issues, Mother argues that the State's pleadings seeking termination are based on a factually and legally void affidavit of removal; that the evidence is legally and factually insufficient under family code sections 161.001(1)(D) and (E) to support the judgment; that the State failed to prove K.B. had been removed from Mother for abuse and neglect under

---

[1]*See* Tex. R. App. P. 47.4.

section 161.001(1)(O) and, in the alternative, that section 153.007 unconstitutionally shifts the burden of proof from the State to the parent; and that the evidence is factually insufficient to support the trial court's finding that termination of the parent-child relationship is in K.B.'s best interest. We will affirm.

## II. PROCEDURAL BACKGROUND

On August 27, 2008, the State filed its petition, and the trial court signed an order for protection of K.B. and set a show cause hearing for September 5, 2008. On September 5, 2008, the trial court held a full adversary hearing and gave Mother limited access to K.B.

The initial service plan filed by CPS stated that the permanency goal was family reunification, with a concurrent plan of termination/adoption, and that the projected date for achieving permanency was August 26, 2009. The State filed a motion for continuance and a motion for extension of the dismissal date, which the trial court granted.

On July 1, 2009, the trial court signed an "Agreed Order For Actions Necessary For Parent To Obtain Return Of Child," listing eight requirements that Mother needed to complete in order for K.B. to be returned to her. On September 17, 2009, the State filed its first amended petition, adding additional termination grounds, upon which it proceeded at trial. At the permanency hearing held on October 8, 2009, the trial court found that Mother had not

2

demonstrated adequate and appropriate compliance with the service plan and set the cause for trial. The trial took place on November 25, 2009.

### III. TRIAL TESTIMONY

#### A. Mother's Testimony

##### 1. Background on How K.B. Came Into CPS Custody

Mother testified that she is the mother of K.B. and that his biological father is M.N.[2] K.B. was born on December 15, 1999; Mother was fourteen years old at the time. Mother took K.B. to school with her; Mother completed the tenth grade and then obtained her GED.

K.B. lived with Mother continuously from 1999 to 2006. They lived with Mother's grandmother[3] from the time of K.B.'s birth until he was one year old.

Then, they moved to the Presbyterian Night Shelter because there were too many people living in the house and because Mother's mother had moved her into the shelter; Mother and K.B. stayed there until K.B. was two years old. After that, they moved back in with Mother's grandmother. In 2004, they moved in with Gregory, a man with whom Mother was involved. Then, Mother rented her own apartment. After Mother lost her job, she and K.B. moved back in with her grandmother, and then they moved back in with Gregory.

---

[2]The trial court also terminated M.N.'s parental rights to K.B. However, he is not a party to this appeal.

[3]At various times in the record, Mother appears to refer to this person as her "grandmother" and as her "great-grandmother." For consistency, we will use "grandmother."

3

Mother testified that living in Gregory's household was "[s]ometimes good, sometimes bad." When they lived with Gregory, K.B. went to school and did well there (i.e., there were no parent-teacher conferences), he was well fed and well nourished, he had plenty of clothes to wear, and he saw the doctor and the dentist on a regular basis.

Mother said that she did not know that Gregory had a criminal background when she met him. While Mother and K.B. were living with Gregory, Mother did not see any crack cocaine in the house. However, Mother suspected that Gregory was using crack cocaine after an incident involving his daughter occurred in the middle of May 2006. Mother said that she had gotten Gregory's daughter dressed and did not see any bruises on her, and then later that day, Mother was accused of having abused Gregory's daughter because she showed up at her mother's house with bruises.[4] CPS told Mother that she had to leave Gregory's house because she had allegedly abused his daughter, and CPS said that she was not allowed to take K.B. with her. So Mother left K.B. with Gregory. Mother's friend Cinnamon, Cinnamon's two children, and Cinnamon's son's father were also living with Gregory.

When Mother left Gregory's house in May, she moved in with her friend Alicia and stayed with her until August. After that, Mother moved in with her

---

[4]Mother was never arrested or prosecuted for that case.

4

mother and stepfather. In 2007, Mother lived in a shelter in Dallas because she and her stepfather did not get along.

In January 2007, K.B. went to live with Mother's aunt[5] because Gregory had a "dirty" urinalysis. Mother said that K.B. stayed with Mother's aunt a year and a half before he went to live with Mother's sister.[6] When Mother's sister could no longer take care of K.B., she took him to CPS. Thus, K.B. came into the care of the Texas Department of Family and Protective Services (the Department) around August 27, 2008.

Mother said that K.B.'s first foster placement was not a good environment for him because he lived with two men who were brothers, and one of them was jealous of K.B. and would tell him that he did not like him. The second foster placement was "a great environment."

### 2. Mother's Contacts, Visits, and Relationship with K.B.

After Mother was asked to leave Gregory's house, Mother said that she saw K.B. on the following dates: in early September 2008; in March 2008 at her aunt's house; on December 15, 2007; about five times in the summer of 2007; and twice in March 2007. Mother said that she visited K.B. infrequently because

---

[5]Mother later explained that this "aunt" was not related to her biologically but was her mother's friend.

[6]Mother's understanding was that K.B. was always in a safe place because he was either with relatives or with people that Mother and K.B. had previously lived with.

5

her aunt's telephone number was always changing and she could not get in touch with her to set up visits. Mother also saw K.B. the week before the trial.

Mother and K.B. "talk about everything"—e.g., how he is feeling, his schoolwork, where she is staying, how she rented her apartment, the status of the case—during their visits. Mother also said that she talked to K.B. on the phone every night.

Mother said that she has taken things to the visits for K.B., even if it made her "broke." She said that she had taken him hats, "stuff for what he needed in Boy Scouts," and money.

Mother described K.B. as "[o]utgoing, loving, sweet, obedient, wonderful, great"; very well mannered; and very respectful of others. Mother said that K.B. has asthma that "comes and goes." Mother testified that she did not know what school K.B. attended. However, Mother said that K.B. does very well in school, always makes As and Bs, and passes all his benchmark tests, including the TAKS test. Mother said that she knew K.B.'s clothes and shoe size, as well as his hobbies.

Mother said that she loves K.B. with all her heart and that he loves her with all of his. However, Mother admitted that she had always been there for K.B. until "all this happened" and that she has not had a relationship with him since 2006. Mother said that K.B. was doing "all right, but he was upset with [her] because of everything that was going on."

6

### 3. Mother's Drug Use and Criminal History

Mother started using marijuana in 1998 when her grandmother died. Mother started using cocaine the day after she was accused of abusing Gregory's daughter. Mother testified that she had been clean for almost three years. Mother later clarified that when she said that she had been clean for three years, that was from cocaine, not marijuana. She had not used marijuana since the end of April or the beginning of May 2009. Mother said that she never smoked marijuana around K.B. and that she never took care of K.B. while she was under the influence of marijuana.

Mother has been arrested once for a ticket but was released after two days. She did not specify what the ticket was for.

### 4. CPS Services

CPS provided services to Mother after the incident involving Gregory's daughter,[7] and Mother went to Positive Influences for parenting classes and completed her psychological evaluation in March 2008.

According to Mother, when the present case involving K.B. first began, she lived in Dallas but was told that CPS was not going to provide her with services in Dallas. Eventually, CPS set up her services in Dallas.

As mentioned above, the trial court signed an "Agreed Order For Actions Necessary For Parent To Obtain Return Of Child." The first item required Mother

---

[7]While Mother was under investigation for allegedly abusing Gregory's daughter, CPS provided Mother with services but did not give her visitation with K.B.

to secure a safe, stable, appropriate living environment for herself and K.B. Mother had agreed during a family conference in October 2008 to move back to Fort Worth so that she could regularly visit K.B. and complete her services, but Mother admitted that she did not actually move back to Fort Worth until September 2009 because she was waiting on housing. Mother believed that she could provide K.B. with a safe and stable environment at the apartment that she was renting in Fort Worth.[8] Mother said that she paid $50 a month for her two-bedroom, two-bath subsidized apartment. Mother had a bed for herself, a bed for K.B., a television, and a refrigerator. Mother also had some clothes for K.B. Mother said that she planned to get more furniture for the apartment.

The second item required Mother to obtain gainful employment or provide documentation of other means of support. Mother testified that she had been working twenty hours a week for Mainstream Promotions on and off for about a year. However, Mother admitted that she had not provided documentation to her caseworker to prove that she had been working seven of the last twelve months. Mother had also worked "under-the-table jobs" during the months preceding the trial. Mother said that at the time of trial, she was no longer doing the "under-the-table" jobs but was back working for Mainstream Productions. She said that she was working in Fort Worth and had the option of working in Dallas on the

___

[8]Mother said that initially, she was staying in her Fort Worth apartment four nights and then staying in Dallas with her best friend on the weekends because the train did not get her to her "under-the-table" job (i.e., distributing flyers) early enough and so she had to stay in Dallas. However, Mother began staying at her apartment in Fort Worth every night after October 31, 2009.

weekends for extra money. At trial, Mother testified that she had $214 total. Mother said that she was going to donate plasma and would receive $40. She said that she does not donate plasma often but that she would do that if necessary to supplement her income to take care of K.B.

The third item required Mother to participate in a drug/alcohol assessment at Recovery Resource Council. Mother said that she did not go to Recovery Resource Council; Mother said that she completed drug treatment in October 2009 with her family therapist.

The fourth item required Mother to follow all recommendations of the drug/alcohol assessment with Recovery Resource Council. Mother was not questioned about the recommendations that she was required to follow or her compliance with this item.

The fifth item required Mother to follow the recommendations of her psychological evaluation with Susan Talmidge,[9] but Mother said that she had not received any recommendations. Mother later agreed that one of the recommendations was for her to attend individual counseling, but she said that she was doing individual counseling before she had gone for her psychological evaluation.

The sixth item required Mother to participate in individual counseling at Positive Influences to address healthy decision-making, adaptive coping skills,

---

[9]The record reveals that Mother completed a psychological evaluation at Positive Influences with Susan Talmidge.

9

and relationship issues. Mother went to Positive Influences but not on a regular basis because her 2054 form expired and someone took her spot. Mother later admitted that before the 2054 form expired, it was good for twelve units, but she used only three of them. Mother showed up tired and sleepy at one of the sessions. During the sessions that Mother attended, she and the counselor talked about Mother's having a false sense of confidence, not being able to recognize signs of relapse, and taking on the responsibility of stability and parenthood. Mother "no-showed" on June 23, 2009 and July 28, 2009 for her counseling appointments.

The seventh item required Mother to submit to random drug testing. No questions were asked about Mother's compliance with this item.

The eighth item required Mother to participate in weekly visits with K.B. at the DFPS office, and Mother agreed that she had not done that consistently.

### 5. Mother's Assessment of Her Performance

Mother said that she had fallen short because she did not complete everything on her service plan and because she did not visit her son as often as she was supposed to. Mother said that she had made twenty of fifty-seven visits with K.B. When asked how she had performed on visiting K.B. consistently, she said, "Not good on my part." Mother admitted that was not fair to K.B. and that it hurt him.

Mother gave herself a five out of ten for her progress in counseling and said that she needed to make a ten for the trial court to return K.B. to her. On the

other tasks that she was required to do—visiting K.B. on a regular basis, maintaining contact with the Department, obtaining housing, living there, furnishing it, and securing employment—Mother also gave herself a five out of ten. Mother said that she thinks that K.B. deserves "[l]ove, support, everything that a parent can do. . . . He would deserve a 10."

Mother agreed that she had been given "over a year to be a ten in CPS's eyes" and said that she did not think that it would take her much longer to get there. She said that this had "hit [her] so hard," that it had taken her awhile to get a grip on herself and to start taking care of her business, and that it took her "so long" to get her services started, so she did not get started working her services until the end of October or the middle of November.

Mother admitted that she could have made a better effort to get K.B. back. Mother said that if she had it to do over again, she would have gone to more counseling sessions and would never have gotten involved with Gregory. She explained, "I would have just kept on doing what I was doing, but it was hard, and I was by myself and I was looking for an easy way to get out and I took the easy way and got me in the predicament that I'm in now." Mother said that it hurt her to hear CPS say that she was not putting in the effort; she was putting in a lot of effort, "but things [kept] happening."

Mother admitted that K.B. had moved "a lot" and that she had certainly not planned that for him when he was born. Mother admitted that she had placed K.B. in danger, but she has never been accused of abusing K.B. Mother agreed

11

that K.B.'s life was "somewhat unstable" due to having "multiple caretakers." Mother also agreed that K.B. needs to have a stable home and a stable person to take care of him. She said that she is now a stable person and has been since September 2009. However, Mother said that she was not going to lie and say that she had been a stable person in K.B.'s life.

Mother had several excuses for her performance. With regard to the services CPS provided after the incident involving Gregory's daughter, Mother said that CPS kept giving her the "runaround" regarding her parenting classes and anger management classes until she "got so mad and . . . blew up." Mother said that CPS had fallen short because there were times when she showed up for a visit, and K.B. was not there. Mother said that CPS had also fallen short when they promised her that they were going to help furnish her apartment and then did not do so. Mother said that CPS had also failed to give her paperwork to the different agencies with whom she was supposed to work her services. Mother further testified that she had a hard time going to counseling because the agency that she went to would not let her in because they thought her address was a Tarrant County address. However, Mother explained that part of the problem was that she had a Tarrant County CPS case but that she had a Dallas address.

When asked if she thought her parental rights to K.B. should be terminated based on her performance of the required tasks, Mother said that she did not

12

think so because she knew of people who had not worked their plans and who had their children returned to them.

### 6.    Mother's Recommendation and Plans

When asked why her parental rights to K.B. should not be terminated, Mother stated, "Even though I know I haven't been correct on my visits like I'm supposed to and I haven't completed one of my services, my rights shouldn't be terminated because I'm still here and I'm still going to fight regardless of the facts."

Mother said that she wants K.B. back "because he's [her] heart" and because she does not believe that K.B. will do well if he is adopted.  Mother agreed that she was asking the judge to return K.B. to her care and said that she was going to live in her apartment in Fort Worth.[10]  She said that her boss was aware that she was trying to get her son back and that he would switch her hours so that she would not have to be in Dallas on the weekends.  She would work noon to five p.m. Mondays through Thursdays.  Mother had lined up a school for K.B. to attend and had after-school care lined up for him at the YMCA or the Boys' and Girls' Club.  Mother said that she would be home from work by 6:30 p.m.

---

[10]Mother said that she had not come up with any relatives to place K.B. with other than her mother, who used to have "a really bad drug habit" and who had not visited with K.B. other than on the phone.

13

Mother admitted that she had been dating a man for three years and was engaged to him at the time of the trial. She said that she had spent the night with him but was not living with him. Mother said that he works in Dallas and that he has two children who live with their mother. Mother said that he is trying to get custody of his children, that he has never been involved with CPS, and that he has never been to jail. Mother said that if everything "goes right" and K.B. is returned to her, she plans to get married in 2010, but she does not want to get married without her son being present. Mother said that her fiancé has met K.B. three or four times but that she wants K.B. to have a relationship with her fiancé and his children before she gets married. Ultimately, Mother testified that she wanted K.B. to go home with her the day of trial whether she gets married or not.

## B. Caseworker's Testimony

Pamela Gillinger, a caseworker for the Department, testified that she had been assigned to the case in which Mother was accused of abusing Gregory's daughter, as well as to the case involving K.B. when he came into foster care.

### 1. History

Gillinger confirmed that a CPS investigator had asked Mother to leave Gregory's home after the alleged abuse involving his daughter and that Mother had voluntarily placed K.B. with Gregory. Gillinger said that Mother had visits with K.B. that were supervised by Gregory. Gillinger said that K.B. was in danger

14

when he lived with Gregory because there was a registered sex offender living in Gregory's house.[11]

In 2007, after Gregory tested positive for cocaine, Mother signed a voluntary placement to allow K.B. to move from Gregory's home to Mother's aunt's home. Mother also signed a safety plan stating that she would not have any unsupervised contact with K.B. and that Mother's aunt would supervise the visits.

From Mother's aunt's house, K.B. went to live with Mother's sister, and from there, Mother's sister brought K.B. to CPS where he went into foster care.[12] K.B. had lived in three foster homes at the time of trial.[13]

### 2. Mother's Services and Compliance

Gillinger testified that Mother's services on the initial case involving Gregory's daughter were originally started in Fort Worth and later moved to Dallas. Mother's plan required her to attend anger management classes, and she did. Mother worked services until she had an altercation with Gregory and moved to Dallas; then, Mother went three or four months without working her

---

[11]Gillinger could not remember the sex offender's name, but the record suggests that it may have been Sylvester, Cinnamon's youngest son's father, who lived with Gregory.

[12]Gillinger's understanding was that Mother's sister could no longer take care of K.B. because his "behavior was very difficult." Gillinger said that K.B. had "occasional misbehavior."

[13]Mother mentioned only two foster homes during her testimony.

services.  If Mother had worked her services, she would have been reunited with K.B.

The service plan from September 2008 provided that Mother would have visitation with K.B. for one hour each week and required Mother to provide safe and appropriate housing, to financially provide for K.B.'s basic needs, to develop a support system to help with K.B., to attend and participate in individual counseling, to attend and participate in anger management classes, to attend and participate in parenting classes, and to complete a psychological evaluation. The service plan stated that K.B. did not have any special needs as of that time but that K.B. was having a difficult time dealing with the separation from his family and that he would be referred to a therapist to help deal with that.

With regard to Mother's compliance with her service plan, Gillinger thought that Mother had attended more than twenty visits but not "a whole lot more" of the weekly visits that were allowed while the case was pending for over a year. Gillinger said that Mother had completed her drug screens, had attended some family counseling sessions, and had completed her psychological evaluation. Gillinger said that the primary recommendation from Mother's psychological evaluation was to attend counseling, which Mother was already doing.  Gillinger testified that she had not called any of Mother's employers to confirm that she was working.

Gillinger visited Mother's apartment in Fort Worth on September 28, 2009, and saw that it was empty; there was a pallet in the bedroom and no food in the

16

cabinet or the refrigerator.[14]  Gillinger said that Mother had requested assistance furnishing her apartment but did not receive any because "[t]he only time we really provide furnishings is when we're working toward reunification."

### 3.    Status Updates

Gillinger reported as of December 31, 2008, that allegations had been made that Mother had lost her temper in the past while disciplining K.B., resulting in his punishment being more severe than his behaviors warranted.  Gillinger also reported as of December 31, 2008 that Mother had not provided care for K.B. in over two years and might require additional support in meeting his needs.

The "Service Plan Review" that Gillinger completed in January 2009 stated that "visits go very well, [K.B.] and his mother are very bonded to each other, [K.B.] loves his mother unconditionally, family likes to go fishing, family is supportive of [Mother], she has maintained contact with CPS, resourceful, determined."

As of May 11, 2009, CPS's concerns, which were listed in the "Family Service Plan Evaluation," included that Mother had a "rigid parenting style" according to the psychological testing that she had completed and that "may be a cause for concern with her anger management issues"; that Mother had not followed through with the requested drug test nor had she provided verification of her employment; that she had inconsistently visited K.B.; that she did not have

---

[14]At the time of the trial in November 2009, Gillinger could not say whether Mother's apartment was a safe and stable environment because she had not been there since late September 2009.

17

stable housing; and that she had denied using drugs when she spoke to Gillinger but had admitted drug use when she was in therapy.

### 4.     CPS's Recommendation and Plans for K.B.

Gillinger testified that she did not believe that Mother could provide a safe environment for K.B.[15]  Nor did Gillinger believe that Mother could provide for K.B.'s physical and emotional needs right now.  Thus, Gillinger asked the trial court to terminate Mother's parental rights to K.B.  Gillinger believed that it was in K.B.'s best interest for Mother's parental rights to be terminated because she was inconsistent—not regularly visiting K.B., not following through with services, not providing stable housing, and not providing documentation that she had been employed.  Gillinger also believed that having the trial court terminate Mother's parental rights would be in K.B.'s best interest to allow him to be adopted.

Gillinger testified that because the current foster parent was not interested in adopting K.B. as a single parent, CPS had "done a broadcast" on K.B. to seek home studies for adoptive placements, and they had received seven or eight responses.  If the trial court terminated Mother's parental rights to K.B., CPS planned to select a family, make a presentation to them, and then move forward with the adoption process.

---

[15]When Gillinger was asked whether her primary allegation was that K.B. had been abused, she responded, "Neglected, maybe."

18

## C.    CASA Advocate's Testimony

Samuel Pacilli, the CASA advocate who was assigned to the case in October 2008, described K.B. as "a fantastic kid."  Pacilli said that K.B. plays flag football with a YMCA team and is active in the Boy Scouts.

Pacilli said that early on during the case, he would bring lunch to K.B. at school, and K.B. would take small bites and pack the rest away for later.  This indicated to Pacilli that K.B. was used to not having food.  Over time, K.B. stopped hoarding food.

Pacilli said that K.B.'s living environment had been "very unstable" and that he thought K.B. was "used to having people he cares about being removed from him, so I think that makes him want to protect himself."  Pacilli said that K.B. was "really guarded" with him and did not open up about his feelings regarding not going back to live with Mother.  Pacilli testified that he had received conflicting messages from K.B. on whether he wanted to return home.  Pacilli said, "I think in his heart, he wants to be with his mother, and I think in his head, he also knows that it may not be the best situation."  However, Pacilli said that he knows that K.B. "loves his mom very much" and that K.B. is upset when Mother does not show for visits.

Pacilli recommended that K.B. not be returned to Mother.  Pacilli believed that it was in K.B.'s best interest for Mother's parental rights to be terminated. Pacilli said that his recommendation to terminate Mother's parental rights was based on the instability in Mother's life and the fact that he had wanted Mother to

19

exhibit more enthusiasm for getting K.B. back home with her. Pacilli opined that K.B. was "getting to an age where it's going to become even more critical that he's in a stable environment and he's given opportunities to flourish, that he's given the options that he needs to become a really successful adult, and my concern is that [Mother] will not be able to provide that environment for him [based on her lack of enthusiasm]." Furthermore, Pacilli had no reason to believe that K.B. would not adapt to a new home if he was placed for adoption.

### D. Trial Court's Disposition

After hearing the above testimony, the trial court took the case under advisement. The trial court thereafter found by clear and convincing evidence that (1) Mother had knowingly placed or knowingly allowed K.B. to remain in conditions or surroundings that endangered his physical or emotional well-being, (2) Mother had engaged in conduct or knowingly placed K.B. with persons who engaged in conduct that endangered his physical or emotional well-being, (3) Mother had failed to comply with the provisions of a court order that specifically established the actions necessary for her to obtain the return of K.B., who had been in the permanent or temporary managing conservatorship of the Department for not less than nine months as a result of his removal from Mother under Chapter 262 for abuse or neglect, and (4) termination of the parent-child relationship between Mother and K.B. was in his best interest. The trial court signed an order to this effect, and this appeal followed.

20

## IV. LEGALLY AND FACTUALLY SUFFICIENT EVIDENCE OF ENDANGERMENT GROUNDS

In her second issue, Mother argues that the evidence is legally and factually insufficient under family code sections 161.001(1)(D) and (E) to support the judgment terminating her parental rights to K.B.

### A.      Burden of Proof

A parent's rights to "the companionship, care, custody, and management" of her children are constitutional interests "far more precious than any property right." *Santosky v. Kramer*, 455 U.S. 745, 758–59, 102 S. Ct. 1388, 1397 (1982); *In re M.S.*, 115 S.W.3d 534, 547 (Tex. 2003).  In a termination case, the State seeks not just to limit parental rights but to erase them permanently—to divest the parent and child of all legal rights, privileges, duties, and powers normally existing between them, except for the child's right to inherit.  Tex. Fam. Code Ann. § 161.206(b) (Vernon 2008); *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985).  We strictly scrutinize termination proceedings and strictly construe involuntary termination statutes in favor of the parent.  *Holick*, 685 S.W.2d at 20–21; *In re M.C.T.*, 250 S.W.3d 161, 167 (Tex. App.—Fort Worth 2008, no pet.).

In proceedings to terminate the parent-child relationship brought under section 161.001 of the family code, the petitioner must establish one ground listed under subsection (1) of the statute and must also prove that termination is in the best interest of the child.  Tex. Fam. Code Ann. § 161.001 (Vernon Supp. 2010); *In re J.L.*, 163 S.W.3d 79, 84 (Tex. 2005).  Both elements must be established; termination may not be based solely on the best interest of the child

21

as determined by the trier of fact. *Tex. Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987).

Termination decisions must be supported by clear and convincing evidence. Tex. Fam. Code Ann. §§ 161.001, .206(a). Evidence is clear and convincing if it "will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." *Id.* § 101.007 (Vernon 2008). Due process demands this heightened standard because termination results in permanent, irrevocable changes for the parent and child. *In re J.F.C.*, 96 S.W.3d 256, 263 (Tex. 2002); *see In re J.A.J.*, 243 S.W.3d 611, 616 (Tex. 2007) (contrasting standards for termination and modification).

### B.   Legal Sufficiency Standard of Review

In reviewing the evidence for legal sufficiency in parental termination cases, we must determine whether the evidence is such that a factfinder could reasonably form a firm belief or conviction that the grounds for termination were proven. *In re J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005). We must review all the evidence in the light most favorable to the finding and judgment. *Id.* This means that we must assume that the factfinder resolved any disputed facts in favor of its finding if a reasonable factfinder could have done so. *Id.* We must also disregard all evidence that a reasonable factfinder could have disbelieved. *Id.* We must consider, however, undisputed evidence even if it is contrary to the finding. *Id.* That is, we must consider evidence favorable to termination if a

22

reasonable factfinder could and disregard contrary evidence unless a reasonable factfinder could not. *Id.*

We must therefore consider all of the evidence, not just that which favors the verdict. *Id.* But we cannot weigh witness credibility issues that depend on the appearance and demeanor of the witnesses, for that is the factfinder's province. *Id.* at 573, 574. And even when credibility issues appear in the appellate record, we must defer to the factfinder's determinations as long as they are not unreasonable. *Id.* at 573.

### C. Factual Sufficiency Standard of Review

In reviewing the evidence for factual sufficiency, we must give due deference to the factfinder's findings and not supplant the judgment with our own. *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006). We must determine whether, on the entire record, a factfinder could reasonably form a firm conviction or belief that Mother violated sections 161.001(1)(D) or (E) and that the termination of the parent-child relationship is in the best interest of K.B. Tex. Fam. Code Ann. § 161.001; *In re C.H.,* 89 S.W.3d 17, 28 (Tex. 2002). If, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction in the truth of its finding, then the evidence is factually insufficient. *H.R.M.*, 209 S.W.3d at 108.

23

## D. Law on Endangerment

Endangerment means to expose to loss or injury, to jeopardize. *Boyd*, 727 S.W.2d at 533; *In re J.T.G.*, 121 S.W.3d 117, 125 (Tex. App.—Fort Worth 2003, no pet.); *see also In re M.C.*, 917 S.W.2d 268, 269 (Tex. 1996). To prove endangerment under subsection (D), the Department had to prove that Mother (1) knowingly (2) placed or allowed K.B. to remain (3) in conditions or surroundings that endangered his physical or emotional well-being. *See* Tex. Fam. Code Ann. § 161.001(1)(D). Subsection (D) focuses on dangerous conditions or surroundings that endanger the physical or emotional well-being of the child. *In re J.A.J.*, 225 S.W.3d 621, 625 (Tex. App.—Houston [14th Dist.] 2006) (op. on reh'g), *judgm't aff'd in part, rev'd in part by* 243 S.W.3d 611 (Tex. 2007). It focuses on the suitability of the child's living conditions. *Id.* Thus, under (D), it must be the environment itself that causes the child's physical or emotional well-being to be endangered, not the parent's conduct. *Id.* Inappropriate, abusive, or unlawful conduct by persons who live in the child's home or with whom the child is compelled to associate on a regular basis in the home is part of the "conditions or surroundings" of the home under section 161.001(1)(D). *In re C.L.*, No. 02-09-00126-CV, 2009 WL 3078588, at *4 (Tex. App.—Fort Worth Sept. 24, 2009, no pet.) (mem. op.). Additionally, a parent need not know for certain that the child is in an endangering environment; awareness of such a potential is sufficient. *Id.*

Under section 161.001(1)(E), the relevant inquiry is whether evidence exists that the endangerment of K.B.'s physical well-being was the direct result of Mother's conduct, including acts, omissions, or failures to act. *J.T.G.*, 121 S.W.3d at 125; *see* Tex. Fam. Code Ann. § 161.001(1)(E). Additionally, termination under section 161.001(1)(E) must be based on more than a single act or omission; a voluntary, deliberate, and conscious course of conduct by the parent is required. *J.T.G.*, 121 S.W.3d at 125; *see* Tex. Fam. Code Ann. § 161.001(1)(E). It is not necessary, however, that the parent's conduct be directed at the child or that the child actually suffer injury. *Boyd*, 727 S.W.2d at 533; *J.T.G.*, 121 S.W.3d at 125. The specific danger to the child's well-being may be inferred from parental misconduct standing alone. *Boyd*, 727 S.W.2d at 533; *In re R.W.*, 129 S.W.3d 732, 738 (Tex. App.—Fort Worth 2004, pet. denied). To determine whether termination is necessary, courts may look to parental conduct occurring both before and after the child's birth. *In re D.M.*, 58 S.W.3d 801, 812 (Tex. App.—Fort Worth 2001, no pet.).

Stability and permanence are paramount in the upbringing of children. *See In re T.D.C.*, 91 S.W.3d 865, 873 (Tex. App.—Fort Worth 2002, pet. denied). A factfinder may infer from past conduct endangering the well-being of the child that similar conduct will recur if the child is returned to the parent. *See In re D.L.N.*, 958 S.W.2d 934, 941 (Tex. App.—Waco 1997, pet. denied), *disapproved on other grounds by J.F.C.*, 96 S.W.3d at 256, *and C.H.*, 89 S.W.3d at 17. Drug use and its effect on a parent's life and her ability to parent may establish an

25

endangering course of conduct. *Dupree v. Tex. Dep't of Protective & Regulatory Servs.*, 907 S.W.2d 81, 84 (Tex. App.—Dallas 1995, no writ).

The record contains substantial evidence of subsection (D) environmental endangerment and subsection (E) course of conduct endangerment to the physical or emotional well-being of K.B. Because the evidence concerning these two statutory grounds for termination is interrelated, we consolidate our examination of it. *See J.T.G.*, 121 S.W.3d at 126.

### E. Analysis

The record demonstrates that Mother has a long history of illegal drug use, dating back to 1998, and that she had been off marijuana for only about six months at the time of trial. Mother also kept company with other drug users, including Gregory and her mother. Mother consented to the placement of K.B. prior to CPS's involvement, allowing K.B. to live with people who apparently did not feed him enough because it was noted that K.B. hoarded food when the CASA advocate met with him. Additionally, Mother moved K.B. into a home with a drug dealer (Gregory) and a registered sex offender (who was not named) and ultimately allowed K.B. to live there by himself while Mother lived elsewhere. The record also revealed that Mother had been accused of abusing Gregory's child and that her punishment of K.B. at times was more severe than his behavior warranted. Mother admitted that she had placed K.B. in danger. Mother also admitted that K.B.'s life was "somewhat unstable," and the record reflects that Mother had moved K.B. from her grandmother's house to the Presbyterian Night

26

Shelter, then back to her grandmother's house, then to Gregory's house, then to Mother's apartment, then back to her grandmother's house, and then back to Gregory's house all by the time K.B. was seven. From there, K.B. went to live with Mother's aunt and Mother's sister before coming into CPS custody shortly before he turned nine. Mother further admitted that she had not been a stable person in K.B.'s life, and the record reveals that Mother's transient lifestyle failed to provide K.B. with the stability that he needed. After carefully reviewing the entire record and viewing all of the evidence in the light most favorable to the finding and judgment, we hold that the evidence is such that a factfinder could reasonably form a firm belief or conviction that the grounds for termination were proven. *See* Tex. Fam. Code Ann. § 161.001(1)(D), (E); *J.P.B.*, 180 S.W.3d at 573.

Although Mother loves K.B. and had made some effort to comply with her service plan and although the record indicates that CPS implicitly approved the placement of K.B. with Gregory, who was a drug addict, the record also reflects that Mother had only recently quit using marijuana; that she did not complete her drug/alcohol assessment until the month before trial; that she did not provide evidence of stable employment; and that she did not secure safe, stable housing in Fort Worth until September 2009—two months prior to trial—despite having had a year to do so. Giving due deference to the trial court's findings, we hold that a reasonable trier of fact could have formed a firm belief or conviction that Mother knowingly placed K.B. in conditions and engaged in conduct that

27

endangered his physical or emotional well-being.  *See* Tex. Fam. Code Ann. § 161.001(1)(D), (E); *J.F.C.*, 96 S.W.3d at 265–66; *C.H.*, 89 S.W.3d at 25; *J.T.G.*, 121 S.W.3d at 124.

Accordingly, we hold that the evidence is legally and factually sufficient to support the trial court's findings on environmental endangerment and course of conduct endangerment.  *See C.L.*, 2009 WL 3078588, at *4 (holding that evidence was legally and factually sufficient to support trial court's endangerment finding under section 161.001(1)(D) when father left child in a home that included a known alcoholic and an alleged juvenile sex offender); *In re R.M.*, No. 14-02-00221-CV, 2003 WL 253291, at *4 (Tex. App.—Houston [14th Dist.] Feb. 6, 2003, no pet.) (mem. op.) (holding that evidence was legally and factually sufficient to support finding that mother engaged in conduct endangering the physical or emotional well-being of child, even though child was removed three days after birth, where record demonstrated, among other things, that mother used drugs, failed to establish a stable residence, and failed to maintain employment); *see also In re J.M.*, No. 02-08-00259-CV, 2009 WL 112679, at *4–5 (Tex. App.—Fort Worth Jan. 15, 2009, no pet.) (mem. op.) (holding that mother's drug use during pregnancy and drug use six to eight months before the termination trial constituted legally and factually sufficient evidence of

28

endangerment under section 161.001(1)(E)). We overrule Mother's second issue.[16]

## V. FACTUALLY SUFFICIENT EVIDENCE OF BEST INTEREST GROUND

In her fourth issue, Mother argues that the evidence is factually insufficient to support the trial court's finding that termination of the parent-child relationship is in K.B.'s best interest.

There is a strong presumption that keeping a child with a parent is in the child's best interest. *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006). Prompt and permanent placement of the child in a safe environment is also presumed to be in the child's best interest. Tex. Fam. Code Ann. § 263.307(a) (Vernon 2008). The following factors should be considered in evaluating the parent's willingness and ability to provide the child with a safe environment:

> (1) the child's age and physical and mental vulnerabilities;
> (2) the frequency and nature of out-of-home placements;
> (3) the magnitude, frequency, and circumstances of the harm to the child;
> (4) whether the child has been the victim of repeated harm after the initial report and intervention by the department or other agency;
> (5) whether the child is fearful of living in or returning to the child's home;
> (6) the results of psychiatric, psychological, or developmental evaluations of the child, the child's parents, other family members, or

---

[16]Texas law provides that parental rights may properly be terminated when a trial court has made a finding under either section 161.001(1) or section 161.003, plus a best interest finding under section 161.001(2). *See In re W.E.C.*, 110 S.W.3d 231, 240 (Tex. App.—Fort Worth 2003, no pet.). Because we have held that termination was proper under section 161.001(1)(D) and (E), we need not address the part of Mother's third issue in which she challenges the trial court's termination of her parental rights based on grounds listed under section 161.001(1)(O). *See* Tex. R. App. P. 47.1.

others who have access to the child's home;

(7) whether there is a history of abusive or assaultive conduct by the child's family or others who have access to the child's home;

(8) whether there is a history of substance abuse by the child's family or others who have access to the child's home;

(9) whether the perpetrator of the harm to the child is identified;

(10) the willingness and ability of the child's family to seek out, accept, and complete counseling services and to cooperate with and facilitate an appropriate agency's close supervision;

(11) the willingness and ability of the child's family to effect positive environmental and personal changes within a reasonable period of time;

(12) whether the child's family demonstrates adequate parenting skills, including providing the child and other children under the family's care with:

    (A)    minimally adequate health and nutritional care;

    (B)    care, nurturance, and appropriate discipline consistent with the child's physical and psychological development;

    (C)    guidance and supervision consistent with the child's safety;

    (D)    a safe physical home environment;

    (E)    protection from repeated exposure to violence even though the violence may not be directed at the child;  and

    (F)    an understanding of the child's needs and capabilities; and

(13) whether an adequate social support system consisting of an extended family and friends is available to the child.

*Id.* § 263.307(b); *R.R.*, 209 S.W.3d at 116.

Other, nonexclusive factors that the trier of fact in a termination case may use in determining the best interest of the child include:  (A) the desires of the child;  (B) the emotional and physical needs of the child now and in the future; (C) the emotional and physical danger to the child now and in the future; (D) the parental abilities of the individuals seeking custody; (E)  the  programs  available to assist these individuals to promote the best interest of the child; (F) the plans for the child by these individuals or by the agency seeking custody; (G) the

30

stability of the home or proposed placement; (H) the acts or omissions of the parent which may indicate that the existing parent-child relationship is not a proper one; and (I) any excuse for the acts or omissions of the parent. *Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976).

These factors are not exhaustive; some listed factors may be inapplicable to some cases; other factors not on the list may also be considered when appropriate. *C.H.*, 89 S.W.3d at 27. Furthermore, undisputed evidence of just one factor may be sufficient in a particular case to support a finding that termination is in the best interest of the child. *Id.* On the other hand, the presence of scant evidence relevant to each factor will not support such a finding. *Id.*

In analyzing the section 263.307(b) factors, the record reveals that K.B. was almost ten at the time of trial, was doing well in school, and was active in several extracurricular activities. K.B. appeared to have adjusted well despite having had many out-of-home placements during his childhood and having been placed in three foster homes. At the time of trial, the main source of harm that was a continuing concern was Mother's unstable housing. The CASA advocate testified that K.B. had mixed emotions about returning to Mother. Although K.B. had lived with a drug dealer and a registered sex offender, as well as Mother and a grandmother who had abused drugs, no testimony was given regarding any abusive conduct towards him. The record demonstrates that Mother was unenthusiastic about working her services, and she gave herself only a five out of

31

ten as far as completing the required services. Mother's testimony regarding her employment left major questions as to whether she had the ability to financially provide for K.B., and she had no support system in place to help her.

With regard to the *Holley* factors, the record reveals that K.B. did not testify, but his mixed emotions about returning to Mother were expressed by the CASA advocate. K.B. did not have any special physical needs, other than occasional asthma. K.B.'s main emotional need was for stability, which was lacking in Mother's life. She admitted that she had not had a relationship with K.B. since 2006. The record did not reveal specific programs that were available to help promote K.B.'s best interest, other than the services that were offered to Mother, in which she did not fully participate. CPS planned to seek adoption for K.B., while Mother planned for K.B. to live with her. Because CPS had not narrowed down a possible placement for K.B., the stability of the proposed placement cannot be analyzed. If K.B. went to live with Mother, the stability of the home would be questionable because Mother had lived in the two-bedroom, subsidized apartment for only two months at the time of trial. Mother had failed to work her services and had visited with K.B. only twenty of the fifty-seven times that visits were offered, which indicates that the existing parent-child relationship is not a proper one. Furthermore, Mother provided several excuses, which were set forth above, for her failure to complete her services.

Considering the relevant statutory factors in evaluating Mother's willingness and ability to provide K.B. with a safe environment and the *Holley*

factors, we hold that a reasonable trier of fact could have formed a firm belief or conviction that termination of Mother's parental rights to K.B. is in K.B.'s best interest. *See* Tex. Fam. Code Ann. § 161.001(2); *In re J.W.*, No. 02-08-00211-CV, 2009 WL 806865, at *7 (Tex. App.—Fort Worth Mar. 26, 2009, no pet.) (mem. op.) (holding evidence legally and factually sufficient to support best interest finding when record disclosed, among other things, that mother used drugs, moved three times during pendency of case, did not complete services, and attended only thirteen of forty-four visits). We overrule Mother's fourth issue.

## VI. CONSTITUTIONALITY OF SECTION 153.007 NOT RAISED IN STATEMENT OF POINTS

In an alternative argument under her third issue, Mother argues that Texas Family Code section 153.007 unconstitutionally shifts the burden of proof from the State to Mother. Specifically, Mother argues that there was inherent vagueness in some of the terms contained in the Agreed Order, that it was unfair to impose new terms and conditions of return on Mother and then "almost immediately" use them as a new ground for termination, and that "the imposition of an Agreed Order and any subsequent finding of non-compliance is a fundamental change in the accepted legal burden of proof." Mother did not raise this issue in her statement of points and has therefore waived the issue on appeal. *See In re J.H.G.*, 302 S.W.3d 304, 306 (Tex. 2010). We therefore overrule the remainder of Mother's third issue.

33

**VII. FAULTY DATE ON JURAT WAS DEFECT IN FORM THAT REQUIRED PRESERVATION**

As required by Texas Family Code section 262.101, the State attached an affidavit to its "Petition For Protection Of A Child, For Conservatorship, And For Termination In Suit Affecting The Parent-Child Relationship." The jurat affixed to the affidavit states, "SUBSCRIBED AND SWORN TO BEFORE ME THIS <u>27</u> DAY OF <u>August</u>, 2003." The year was typed on the jurat; the day and the month were handwritten. The trial court signed an order dated August 27, 2008.

In her first issue, Mother argues that the State's pleadings seeking termination are based on a factually and legally void affidavit of removal. Specifically, Mother argues that it is impossible for the affiant to have had personal knowledge of the events of August 27, 2003, or that facts from 2003 would be relevant to the removal that took place in August 2008.

An "affidavit" is "a statement in writing of a fact or facts signed by the party making it, sworn to before an officer authorized to administer oaths, and officially certified to by the officer under his seal of office." Tex. Gov't Code Ann. § 312.011(1) (Vernon 2005). The statutory definition of "affidavit" contains no requirement of a date. *See id.*; *see also Omodele v. Adams*, No. 14-01-00999-CV, 2003 WL 133602, at *5 n.1 (Tex. App.—Houston [14th Dist.] Jan. 16, 2003, no pet.) (mem. op.). The lack of a specific date in the jurat of an affidavit does not render the affidavit invalid. *See Omodele*, 2003 WL 133602, at *5 n.1.

Here, the affidavit contained the necessary requirements to meet the definition of an "affidavit" under the government code. *See* Tex. Gov't Code Ann.

34

§ 312.011(1). The fact that the affidavit contained a defective date did not render the affidavit invalid. *See Omodele*, 2003 WL 133602, at *5 n.1 (holding that the lack of a specific date in the jurat of an affidavit does not render the affidavit invalid). Instead, the defective date is akin to a formal defect in the verification of a plea or a pleading, which is deemed waived unless the defect is challenged. *Cf. Galaznik v. Galaznik*, 685 S.W.2d 379, 382 (Tex. App.—San Antonio 1984, no writ). The record here, however, does not contain an objection from Mother regarding the defective date in the jurat. Because Mother did not object to this formal defect in the trial court, she has failed to preserve her argument for appeal. *Cf. id.* (stating that "[h]ad the lack of verification of the pleading been complained of before trial by special exception, it would have been well taken" and holding that the defect in the pleading was waived). We overrule Mother's first issue.

## VIII. CONCLUSION

Having overruled all of Mother's issues that are necessary for disposition of this appeal, we affirm the trial court's judgment terminating Mother's parental rights to K.B.

SUE WALKER
JUSTICE

PANEL: LIVINGSTON, C.J.; WALKER and MEIER, JJ.

DELIVERED: October 14, 2010